Good morning, Your Honors. May it please the Court, my name is Bob Maeve on behalf of Michael Planet, the Court Executive Officer of the Superior Court of California, county of Ventura. I'll try to reserve five minutes of my time and I'll keep an eye on the clock. Wait a second. Do we grant you additional time? So is it five minutes for the amici? We don't have an amici in Planet. Courthouse News has an amicus in Planet. We have an amicus in Misaki. Courthouse News does not. I should have issued a game card. All right. Yeah, put them back at 20. With all these issues floating around in both of these two cases, what I thought I would do is start by taking a little bit of a step back and give you the perspective that Ventura Superior Court has with respect to this case and why we are here. And then I think I've only got three arguments that I'd like to sort of enforce for our argument this morning and then, of course, answer your questions. But the big picture is, and you just need to take it as a given, we heard the court when we were told not once but twice, go back and try the case. So we did that. After Planet 2, the unpublished remand, we engaged in discovery and then both sides moved for summary judgment. And the key thing for our perspective is what we moved for on summary judgment and what Courthouse News moved for on summary judgment. We had, on behalf of the court, basically two arguments. The first was there's no right of same-day access, and the reason that we made that one of our primary points was that that's what the complaint alleged in this matter. The second thing we said was, based on the standing statements in Planet 1, this right of timely access, we're not quite sure what that is exactly, but we certainly need it because the new scanning policy gives you 97 percent access either the same day or the next day, depending on where the complaint is received during the day. So far, so good. Courthouse News comes back, and they file a cross-motion. And it's important. It's their supplemental excerpts. It's page 214. But their motion was to essentially enjoin us to give from denying access to new civil unlimited complaints after processing and to require Ventura Superior Court to provide access to new unlimited civil complaints, exhibits, and amendments no later than the end of the court day on which they are filed. So, so far, we do have... So remind me of your policy. The complaint, the problem now is, apparently, that you scan up until, like, 3 o'clock, but filings are continuing until 430. So there's a certain number of filings that they don't get access to until the next day. That's correct. That's the current policy. It went into effect in 2014, two years prior to this motion being heard. And the rules of court contemplate that. Just because of the lack of money and resource allocation, the rules of court say you can close early, but if you do, you have to have a drop box. And so the drop box is implemented pursuant to the rule of court, and that's what happened. So the policy was, and the facts support this, pretty much everything up to 3 o'clock, they were scanned and provided on a computer that day. Anything after 3 o'clock, some of those did make it to the computer, some of them didn't, but they all made it to the... I shouldn't say all that. Be careful. I'm sure that there was one or two. But the vast majority made it to the computer the next day. Was there anything other than just the time at which the complaint was dropped into the box that determined which complaints made it into the computer or not? Time. It's time. And I can tell you, because I walked through the process, they made a point of gathering everything up and making sure that they had everything. And they know a court-of-justice reporter always comes at the end of the day. So they know she's coming, and they want to make sure that they're complying with their policy. Policy says 3 o'clock when it closes, and so they start bringing in the complaints to make sure that they're scanned and available. Let me ask you, we're talking about civil complaints here? Civil unlimited complaints, yes. What is a civil unlimited complaint? The distinction is monetary. I believe it's $25,000 and less is a civil limited complaint. Fewer discovery options, civil unlimited, punitive damages, most personal injury cases, that kind of thing. Where do these things like paternity, child support, child custody. Domestic violence. Domestic violence. Civil unlimited. I'm sorry, excuse me. Civil unlimited. So they are part of this? All of those are civil unlimited. Now, we need to be clear. I thought it has to be over $25,000 in dispute. Some of them are subject matter jurisdiction, Your Honor. I need to be clear. The way that you may or may not know this, California does not have a uniform, unified trial court system. There's 56 counties, and historically they were run by the individual counties. So when eventually funding was taken up to the state, so now it's a state-funded entity, the systems remain. So there are 56 different trial courts with 56 different ways of doing things. So conceivably we could see you 56 different times. Yes. For better or for worse, yes. And the reason I say that is, and that's the reason I'm saying we've got to keep Yamasaki and Planet apart because they're quite different. The two main differences for your purposes are, number one, Planet, our case, the first case, is a paper file case, not e-filing at all. Second, and more important, in Planet, the evidence is that they received, they, the Ventura Superior Court, received 6 to 12 complaints a day, as compared to Orange County Superior Court in Yamasaki. So you answered yes to Judge Murguia's question on domestic violence. Yes. But that's a criminal complaint. There are some, well, you know, I need to back up. And a TRO, if you're talking about, like, someone coming in on a TRO, that would not be a civil unlimited complaint. Well, I... No way. Orders of protection... I will go back and check that, and I don't want to shoot from the hip on it because I don't think... I mean, I understand what civil unlimited is. Right. And I know that, but, I mean, it doesn't include criminal. Correct. But the reason that I ask these questions is that when I read the amici, they talk about, and this amici was trying to suggest, I guess, in Planet, that there were some things that just did not, would always be restricted, like in trusts, estates, domestic relations, child custody, etc. And I guess I'm trying to figure out, they've always been restricted as far as I know about, so I was trying to figure out if they're a part of your statistics. The statistics that I'm giving you are complaints that are scanned. And that's what I was trying to get to, the difference in numbers. Orange County has lots of those types of complaints. The evidence of the record is that Ventura does not have as many. Ventura reserves the right, and its policy says so, to make sure that confidential complaints are not scanned and put forward. But as a practical matter, when we looked at it in the period of time that we were talking about for Ventura, because the volume is so low, we weren't aware of a case where that was so. And I wouldn't want to misrepresent to the court that, yeah, we were keeping confidential documents out. Because as far as I know, the record doesn't support that. And it does in Yamataki. No, okay, stop talking about Yamataki for me, okay? Just make that statement again. As far as we can, there is a reservation in the court's Ventura's policy to withhold confidential documents, confidential complaints. And what would constitute a confidential complaint? It is not defined in the Ventura policy, but they would include complaints for which a seal request is available, trade secret cases, and presumably other complaints that were made confidential by statute. We've given you those examples in Yamataki. But, so they do not, as I understand it, they do not even have anything to do with the statistics which you're giving us. In those instances, they would be, if you will, taken from the public forever, or for as long as the court suggested, or whatever. In Ventura. That's all I'm talking about. In Ventura, the answer to that is no, because we did not find evidence of those types of cases being withheld in Ventura. So as a practical matter, yes. Well, they would be, if there were cases there like that, they would be. It's just you didn't find any cases like that? Is that what you're telling me? I'm telling you that as far as we know, there weren't any of those types of cases. I thought part of your argument in reasoning for the delays is that privacy concerns of some of the parties are at stake. That's what I understood in your briefing. So then my question, I guess I want to know, is that true? And if so, aren't most of the privacy concerns basically mitigated by the fact that the court must have certain processes in place to address those issues, such as requiring filing certain types of cases under seal or in a specific manner? I guess of these privacy-related types of cases that you're concerned about, what percentage of the docket do they make up? In Ventura, not very many, Your Honor. We don't have a specific number because that's not where the discovery went. So then how does that contribute to your delay, or did you not use that as a basis? Because that's how I read your opinion. The point that we're trying to make is the scanning policy essentially said we will scan everything and make it available. Now, there weren't any—we reserved the right to hold back confidential documents. We're not aware of a case where that was happening, and we're not aware of a case where a document was withheld from scanning because of confidentiality. That's the testimony. So the numbers that I'm giving you are the actual numbers of complaints coming in and complaints making it to the scanner. But it seems to me you're saying—and I guess this is what I'm trying to figure out— it seems to me that on the basis of this record, one is suggesting that all of these complaints are made available by certain amounts of time, but then I know from having been a lawyer in Idaho, there's a lot of complaints that never the public is not given access to. And so I'm saying to myself, as it relates to this argument, what do we do with those? I mean, it seems to me that that makes a bigger argument for maybe there isn't supposed to be access at all. What I really would suggest is that is part of what Judge Otero found was an irreconcilable factual conflict. He couldn't make a decision on timeliness. So what we really think should happen here is that this case should be remanded back so that we can go to trial and these issues can be developed, understanding that we've been here twice. I think we even need to make a determination as to timeliness. I mean, we've established there's a right of access in Planet One, right? Yes. And what you're suggesting is that you've now, with your post-2014 policy, you've now complied with that by invoking some kind of a time, place, and manner restriction. So why is it necessary to – I mean, you're complying, you're making everything, but they're at a certain point in time of day. This isn't viewpoint discrimination. This isn't content-based. It's just a matter of time when your resources require you to close. Why aren't you arguing that that's a reasonable time, place, and manner restriction, which is what we suggested in our very first opinion. We got that, Your Honor. We handed it to you. Your Honor, we got that. Here's the one thing that Planet One didn't do. Planet One says there's a right of timely access. Everybody gets that. But the thing that at least – this is the Ventura Court's perspective that Planet One didn't do is say exactly how do you deal with that. And if you look at Ley and Salazar and all the press enterprise cases, what those cases all say is look at the particular restriction that's under review, and the first question is is there essentially a right of greater access based on experience and logic. So you have to look at – I don't even think you apply experience and logic to timeliness, and you have to look at is what you're doing a reasonable time, place, and manner restriction. Does it avoid – are you not saying certain types of cases, based on what issues they raise, are going to be withheld? You're not doing that based on really what's said in the complaint. You're saying where there's a motion to seal, the judge has to have time to consider that before it's made available to the press and the public. Where the statute requires it to be withheld. Right. I think technically, time, place, and manner is a defense, right? It's a regulation on protected speech. Yeah, that begs the question. Is it protected speech, which is the point that press enterprise, I think, is designed to dis- We've already decided that. Have we decided that? That's the question. There's – do we understand that there's timeliness? Timeliness requirement, yes. But the court did not say when, where, why, and how that attached. It just said as a matter of standing. You're arguing your point now that you think it doesn't attach until some judge has touched it. Well – That's clearly wrong to me. I respect that. I understand that you're on a bench with the California courts, and, frankly, no other circuits have held. But I understand your point. All I'm saying is, I think it's a two-step process, and the first step of the process is, what does the press enterprise test require you to do? And then if you don't do it, in this case – so the hypothetical. Let me push you a little bit on that. Sure. Do you think that the First Planet and Planet 2 left open the issue of whether a First Amendment right of access attaches to the civil complaints? I don't – no. I think the holding in Planet – both of them, because they do this – was that there is a right of timely access. So if there's a right of timely access, where is the experience test applied in making that determination? It asks, in a particular case, what is the defendant – I'm not asking what you do in a particular case. Okay. My worry has been, was it applied in Planet? Because the experience test – I mean, what experience is there, if we've got all these cases, which I've now outlined to you today, which have not got access, what is there which would suggest that the experience test would make them have access? Experience would ask, on the level that you get, whatever level the court is currently providing. In this case, it would exclude confidential complaints. So we're only dealing, in this case, with those complaints which are not confidential? That are not confidential by law? Yes, Your Honor, I think so. Does your opponent agree with that? You know, for example, if the Safe at Home statute says that this complaint must be maintained in confidence, the false claim – So any state law which makes them confidential, it does not – this case does not apply to. Then why – sorry, let me – you can answer that question. I mean, my worry is I'm trying to figure that out. Because the bottom line is I never saw anybody really delve into what a civil complaint is. And all the things that may happen in a civil complaint context. So that's why my question's today. And I understand that. And I have to be very careful, because Judge Wardlaw and I were having a discussion last time I was here two years ago, and I spoke over her, and I am desperately not going to do that. What's the answer to Judge Smith's question? So the answer is that those complaints are not – Courthouse News is not claiming a right to confidential complaints. Period. So from my standpoint – Oh, anything the state determines is confidential. By whatever way it determines it. This is – whether the court does it, or whether the legislature does it, or whatever, if they determine it's confidential, that's not what they want. Is that what you're suggesting? I believe that's what they're suggesting, because in the papers it says, I don't want to mix cases, but in Yamasaki they've said that. I don't believe it. Well, just argue your case. Just argue your case. So the answer, as far as I'm concerned, is this is all about non-confidential civil unlimited complaints. And so if that's the case, I just want to make sure I understand your position, that the delay is attributed for your client to have time to weed out those confidential – Now there's no delay. That's the point. Okay, so now there's no delay. The scanning policy, we take them, we scan them, and we make them available. But supposing there was a complaint that came in that was different than what you think they've been in the past. What delay would it be to get rid of the confidentiality? I suppose, for example, there are complaints where there's a pro per application where someone is submitting financial information, and the court does not release that to the public and can't for all sorts of reasons, and those would not be scanned. They scan the complaint. And as I understand, you also don't scan attachments to the complaint. Correct. But if there's a reference to an exhibit, then Cordell's News could ask for that exhibit. Absolutely. And there's no evidence that they ever did, by the way. If you claim there's no delay, then why are we here? I don't understand. So what's your view of no delay? Our view of no delay is the 97 percent figure, which encompasses complaints that are received before 3 o'clock on a day are made public that day. If something comes in from 3 o'clock in the drop box, it's made available the next day. At what time? Well, it's scanned that evening, so they'll get it, and in the record, you'll see that the reporter is going online and seeing the docket that they're there. So can you tell me, because I understand, you're saying 90 percent. They're saying 49 percent doesn't get through for another five days. I don't understand. Let me ask the question here. Okay. I'm having a hard time understanding what the real number is, and it seems like that's the whole point of this lawsuit is that there's some alleged delay. So can you tell me what is the average time from when a complaint is filed to when it is available? How many hours, how many days? I could put it to you this way, because this is what the record shows. So 97 percent of them are available by the end of the next business day. So that includes all the ones that are made available on the day that they're received and then giving them the grace period, virtually everything by the next day. And under your view of the statistics, what's the time gap for, like, the 3 percent that's not made available by the end of the next day? It's in the record, human error, and next day. It just depends. You lost a file. I mean, the normal things that an administrative office would have. So how and why are you and CNS been so disparate in your assessment of the delays in access to newly filed complaints? I mean, how did you reach your 97 percent number, and what's wrong with CNS's assessment of what it states? I'm running out of time. Answer the question. There's lots of important questions. There's two answers. Answer number one, they're relying on the pre-scanning policy, which was abandoned in 2014. There were greater delays. I'm sorry, say that again. There were two policies. One is the pre-scanning policy, which had lots of delays. Let's talk about the current policy. Okay, and with respect to the current policy, when they point out delays, the record shows this, that they are identifying cases where I didn't see it on the day one, I saw it on day two, and it was received at 4 o'clock on a Friday before Thanksgiving, and so the next business day is four days away. They claim that's a four-day delay, but I don't have anybody there on the weekend and during Thanksgiving to process it. So that's the biggest difference. So is all of the delay we're talking about here, whether we're with them or whether we're with you, does it all have to do with just the delay in scanning, or is there any delay associated with a review of confidential information? The answer to that question, there is no delay with respect to the review for confidential information. If the complaint is received by 3 o'clock, unless there's some – the policy says typically just to be careful, but as a practical matter, if the complaint is in before 3 o'clock, it is scanned and made available. So it's all about scanning. Yes, and there's only so many people in the clerk's office. Short of saying, well, the First Amendment requires me to do it, you know, the minute they come in, which I think is unreasonable, I think it's a reasonable policy when we have our due time and place manner on it, to say, well, it's 3 o'clock, we'll get you everything, and if you don't get it that day, get it the next day. And by the way, Courthouse News's reports are very, very limited. It's not as if they're even referring to the individual. How close are you to electronic filing? Not. Again, because of the different fiefdoms, everybody is different, and they're thinking about it, it's under consideration, and I haven't checked recently to see where they are. A lot of your issues have to do with resources. Isn't it cheaper to have electronic filing as opposed to paper filing and scanning and copying? Isn't it much cheaper and more efficient? In the long run, probably. In the short run, the cost of changing over is huge, and that's one of the biggest issues. I don't think that's in the record, but that's the practical answer. It's the buildup to get to the point where you move over from papers to scanning. It's very expensive because you don't have the systems for it. If every court in California had electronic scanning, would we even be having this debate? I don't know the answer to that, and the reason is, in some cases, it's one of the reasons there's no history, no experience. Some courts defile, but they process first before they let them out. The Seventh Circuit does that in the Brown case that we're appealing. I'm not quite sure what we do, but I think all of our stuff that's filed doesn't have a request for sealing. It's automatically available to people with a PACER account. Right, but the Ninth Circuit reserves the right to call it back, the judgment that, for example, again, this is not Ventura, but Yamasaki, that's the judgment they made is they didn't want to do that because once it's out there, it's out there. They would rather check it first before it goes out there. Before you walk away, I'm still not clear on what you assert the test should be for timely. So, in a nutshell, first, you look at the existing policy, whatever that is, and then the lame sows are in those cases. They ask, is the restriction justified by the time, place, and manner test? So you look at this case, you look at Yamasaki, is the restriction justified, experience, and logic? That's where you get into disagreements about when's the complaint come for review and all that, but that's how we view it. The second thing is, if they then find that there's a right of First Amendment access based on history, experience, and logic, then you ask, okay, if the defendant, if the state is violating that or isn't complying with that, what's its justification? And in our case, time, place, manner, because we're not closing anything, they get it the next day. So the question is, in a delay case, do you, you know, is it contended? You ask whether it's reasonable. Yeah, yeah, essentially. But it's a variation of the time, place, manner test. In front of Judge Guilford now, as a sidelight, we're exploring one of the issues about whether alternative means of communication. That's in Yamasaki. Yamasaki. Let's talk about that later. Thank you very much. But in any event, it's not clear how alternative means of communication fits when you're talking about access to a complaint. Well, I'm not sure. I mean, I think if you were to do that test, you wouldn't get into alternative means of communication because you're really just going into the, I mean, you'd have to fashion a test that fits the situation, which we've done. I mean, we do in the First Amendment all the time. We do the law of billboards, for example. Exactly. And so we do that all the time. Intermediate scrutiny. For whatever the medium happens to be. Rose, I am so far over my time. You are. You're over because we've taken you over, but I want to ask one more question of you. When I look at experience and logic test of the planet or of the press enterprise, if you will, I'm looking to determine what is given the First Amendment right of access. And I think that's what you look at. That's what they used in that criminal proceeding to determine if that was to get that, and I think that's the test I use in this proceeding. Once using that press enterprise test of experience and logic, I'm trying to figure out why experience and logic has anything to do with once the standard has been determined. In other words, once I've determined that there is a right of access because of that standard, it seems to me that the next time that I apply or the next test I apply is the test of time, place, and manner. We're not back at press enterprise anymore. We're at the new test of time, place, and manner. If I didn't say that clearly, that's what I meant. Okay, so if we're in time, place, and manner, and we look at that test, can I apply every part of that test to this particular situation? That's what Judge Wardle and I were just chatting about a little bit, Your Honor. I understand. That's why I'm going back to you. Right, and the answer is you could. It gets a little strange. The first two are fine. The first two are easy. Right. The third one is not easy. Right. If you look... Do I just leave it out? No, I don't think so. Or do I reformulate it to suit myself? Well, the court... This is Judge Wardle's point. I know what her point is, but I'm just trying to figure out... I'll put it this way. This is an intermediate... This is not strict scrutiny. This is intermediate scrutiny, and the courts have the... Not the discretion, but they have the ability to fashion a time, place, manner test that meets the medium that you're addressing. The billboard cases are like that because they don't have an alternative means, but there are lots of ways to focus on it. There's a lot of precedent for doing it that way. Okay, so... And by the way, there are access cases on that, too. Right. So if we get to there, then if I look at the really time, place, manner test, it seems to me that the ultimate on that test is content-based restriction, even with time, place, and manner. But this isn't... I don't think anyone says this is a content-based... It's only content-based restriction if, in fact, you are, if you will, denying access based on confidentiality. Respectfully, I don't think that's quite right. Content neutrality means you're picking on viewpoints, for example. I don't like your opinion, but I like yours. But isn't there a viewpoint about whether something is confidential or whether it isn't? Isn't there a viewpoint as to whether a particular action in a probate case ought to be given access or not? Isn't the same thing? Can I look at the same thing when I'm looking about mental health and disability or when I'm looking at child custody or child support? Respectfully, Your Honor, I suppose those are distinctions. The point of content neutrality is that you're picking on the... You're making judgments based on viewpoint. That's not viewpoint. That's subject matter. That's not content neutrality. That doesn't offend the content neutrality rule. I got your point. I'm way over. Why don't you... Just folks here from the other side. Okay. Okay? Thank you. Let's see if we can form what's really in dispute here. Good morning, Your Honors, and may it please the Court. Rachel Matea-Boehm for Courthouse News Service. I had an argument planned, but listening to the questions that the panel's been asking, I think I'll begin by trying to address some of the questions that the panel has. First off, as to the issue of confidentiality as it relates to the Planned Parenthood case, that was raised in the Planned Parenthood case, but only narrowly. There was a question about fee waivers in that case and whether they were confidential. I think there was a question about... And this is in the context of reasons to justify the process-first policy that was in place at the beginning of this case. And one of the reasons was these fee waivers. Another reason, I believe, may have been we might need to redact. But when we took discovery, and this is reflected in Judge Otero's opinion, there were admissions in depositions that they did not review the complaints to determine if they contained confidential information. They did not review the complaints before scanning. And the fee waivers were a separate document, separate and apart from the complaint. Well, I guess I read all about this, and I guess that comes to my question again. It seems to me that the complaints, as put forth, leave out a whole category of complaints that now the amici want us to think about. Or in other words, complaints about minors, complaints about medical information, complaints about child custody, complaints about domestic violence, those kind of complaints. They seem to be important. Is that not what you're after? Are you not after looking at those complaints right up front? Courthouse News does not seek to review complaints that are accompanied by a motion to seal or are confidential by law. And that... So any state law or any judge-made ruling that would suggest that a certain complaint is confidential, you're not seeking that? No. And those are not the kinds of complaints that Courthouse News reviews day in and day out at federal courts and state courts across the country. You agree. No, your answer is that yes, you agree with Judge Smith that you are not seeking that. We are not seeking confidential complaints, no. We are not. So in my book, you're then saying that whatever the court, whatever county court it is, or whatever court it is that you're trying to get these, to the extent they've determined they're confidential, you do not seek those complaints? That's correct. To the extent it's confidential by law or it's accompanied by a proper motion to seal, we are not seeking those complaints. To the extent it's been determined confidential, we are not seeking those complaints. We're seeking publicly available complaints, complaints to which we contend a presumption of access attaches under the First Amendment. So do you claim you're still experiencing delays in this case right now as we speak? In Ventura Superior Court... What case you're arguing right now? The case we're arguing right now, we are not as a result of the injunctive relief entered by Judge Otero in this case. And again, there are two policies at issue. It's not just about the scanning. There's the policy at the beginning of this case, which was you can't see these new complaints until after they're processed. And that procedure was not abandoned until after this court's first decision in this case. In 2014, four years into that case. But even today, even today in the briefs, they are contending that they have a constitutional right. They are not constitutionally foreclosed from withholding access until after processing. Mr. Flanagan argued in the court below that that was moot. We disagreed, and the court ruled in our favor on that. So the process prior to Judge Otero's ruling, were you experiencing delays? Yes, we were experiencing delays. Tell me how. I'm confused regarding the numbers. I'd like for you to clarify. Under the scanning policy, the 97% statistic that was given was for complaints that were scanned that day, not complaints that we saw that day. Because after 3 o'clock, they were continuing to scan into essentially an empty room. It's because Courthouse News reported was required to leave the only place where complaints could be viewed. They were not available online, only at the courthouse. And to what percentage of newly filed complaints do you assert you were not getting same-day access to prior to Judge Otero's order? It was substantial, and I apologize, I don't have the exact percentage. That's really key, because you both come with your statistics, and it's hard to reconcile them. I mean, at one point, you all were saying 47% we don't get for up to 5 to 9 days. I don't understand how the data can be that off. So somebody's really looking at it in one way. I don't know if it's inaccurate or not, and I'm just trying to get to the bottom of it. And trying to figure out, are you really experiencing a delay prior to Judge Otero's ruling? Because that's the issue before us. And of those complaints that you were not getting access to on the same day that they were, I guess, filed, what is the delay in terms of hours or days that you received those complaints? That's an important question to me. So do you have an answer you can give me? So we described those delays, and they are in the record, in the declarations of Julianna Corlock. But what Judge Otero found is that he did not have to reconcile that dispute, because it was undisputed that the room where they could be seen closed at 3 p.m. every day, and the complaints could still be filed until 4.30 every day. So with the new complaint, I mean the new policy, let's just put the old policy in advance for a minute. The new policy, what percentage of complaints are you not seeing until the next day? Again, I apologize, I don't have the statistics. Well, that's a really key question that would have been helpful, and I'm sure you have a lot of information. I know Judge Otero, I think, didn't go that route in terms of making the ruling, because he would have probably had to have a trial to figure that out. Instead, he went with the time. But we have this issue before us, and it's really hard to know what the average delay is in access to the newly filed complaints under the system that was in place prior to Judge Otero's order, which is not the original system. We had significant percentages, and I don't want to misspeak that they were in the 20%, 30%, 40% range, but I want to be careful to note that this also particularly hits the most important cases which tend to be filed at the end of the day. Why is that? I mean, that's kind of weird. How can you say that? Most important. How do you define most important? The ones that in courthouse news' experience have been found to be the ones that subscribers care most about. They tend to generate the most news. They tend to be the most public interest. It's been my experience as a lawyer that... Do we have a declaration to that effect that the most newsworthy complaints are filed between 3 and 4.30 p.m.? We have a declaration to the effect that the most newsworthy complaints tend to be filed toward the end of the day, and that is the Gerdner Declaration in support of the motion for summary judgment in this case. Why would that be? We have found it to be the case. I'm asking you, why would that be? We have found that lawyers wait until the end of the day to file... Because they need every last minute to get their papers done? To get their papers done. It's a last-minute kind of thing. That is in courthouse news' experience over decades of reporting on newsworthy complaints. That is what it is found to be the case, and that is contained in the declaration. So we're going to make a policy based on that? I mean, we're going to make a ruling based on that? The scanning policy cut off access. I actually think that Ventura is, at this point, is probably doing the best it can do, given that it doesn't have electronic filing. Judge Otero said that Ventura gave no reason why it should cut off access for the day at 3 o'clock and nevertheless allow complaints to be filed until 4.30. No reason whatsoever, and it is their burden. What are you asking for? What are you asking for, that you... Either that they allow your reporter to stay until 4.30, or that they change their filing deadline to 3? Well, they did make a couple of changes, and that is reflected in the documents in the cross-appeal in this case, which is the fee appeal. They changed their filing deadline so that the hours with which a complaint could be viewed and the hours with which filings were accepted were the same. So now, Cortez, as a reporter, can continue to see new complaints up through 4, and she's even allowed to stay in the records room later. And now complaints can be filed until 4. It's like the right now... I guess I'm trying to understand. I'm sorry for interrupting you, but you said Judge Otero found, you know, that there was no... Ventura County gave no reason, but Judge Otero also found there was no right-to-same-day access, didn't he? Judge Otero said... Yes or no? He said there was no bright-line rule to same-day access in all instances. I don't think... But he did say there's a right to timely access, and he said you can't cut off access for the day while complaints can still be filed. OK, so they've remedied that by... They changed their drop-box hours, so the complaints are now dropped until 4 o'clock, and the reporter can be there through 4 o'clock and even later. But what is your complaint now? If they've really... I mean, they've modified the policy. They've done that because there's been an injunctive relief issue, and we are here today to ask that that order be affirmed. And so every... I'm sorry, just one last question. So what's your assessment of timely access What's your test and what's your assessment of timely access? Because Judge Otero seemed to say that there was no, I guess, what you have clarified, bright-line rule to same-day access, but he did say there should be timely access. What's the test or what's your justification for why we should give you what you're asking for? I think timely is the functional equivalent of contemporaneous access, and that's what many of the other circuit courts talk about when they talk about what access is required under the First Amendment. The Seventh Circuit talks about it in Grove Fresh. The Second Circuit talks about it in Logosh. The First Circuit talks about it in Pocaskey. The Fourth Circuit talks about it in Company Doe. When you're talking about a civil proceeding, it means you can be right there. In the context of a new civil complaint, when it's just been filed, it is representative of the new civil lawsuit, and we believe that timely access, in the context of a newly-filed civil complaint and a very predictable situation where a reporter is showing up every single day to review those new complaints, means something pretty quick, and it means the absence of policies, such as those at issue with this case, that cut off access. I'm not sure those cases are the same facts as this one. So I'm just trying to figure out. You all have presented us a question to try to answer, and I'm just trying to get information from you both, which seems very difficult. I don't envy the district court judges here, because trying to figure out even what contemporaneous in your view means, do you count for the fact that when you have a court with physical filings and short staff, what does that mean? The filings are sitting right there, and we gave evidence in the declarations that we filed in support of our motion for summary judgment. Where they're in a stack, providing access is not a function of cost or staff resources. It is very easy to do as evidenced by the many courts that do provide that access, and these are the new civil lawsuits. The only way you can find out about this new civil lawsuit is by seeing the complaint. That's what this court said in its first decision in this case. And we contend that timely, in that particular context, means something pretty quick. Do you have to draw a bright line? No. Might there be a situation where a complaint slips by here and there, and would that violate the right of timely access? No. But it means the absence of policies that on an ongoing basis deprive the public of access. But doesn't... I'm just trying to figure out if you account for the fact... Does Ventura County have to docket those physical files at least? So I'm just trying to understand. Docketing and timely access are not mutually exclusive. They can both be accomplished. We're certainly not saying... But do they not take time? I mean, for physical access? I mean, when you have physical filing, doesn't it take some time? And if you have a number and you're short-staffed, I mean, you don't account for that at all? Docketing need not precede access. Docketing is the functional equivalent of processing, and that is one of the things that... That was Ventura County Court's argument at the very beginning of this case. They said, we can't give you access until we're done processing. And we established why that was not the case. That was under the first policy. This is the first policy, yes. That's under the first policy, and that was accepted by the court, and then they changed their policy. They continued with their first policy. They changed it in 2014, after this court's opinion, to the scanning policy. Both were before the court on the motions for summary judgment at issue in this case. Right. But he made two different rulings on those. The court found that both policies were unconstitutional and did not provide timely access. And that the Ventura clerk had not met his burden under either the compelling government interest test or the time, place, and manner test to provide evidence to meet the elements of those tests. I'm not sure the court found that they were not timely. I'm not sure that what the court did in Planet 2 was not send it back to have the court think about whether it was timely. My worry is that what test do I apply to determine this timeliness? I mean, and that's why I ask your colleague the same question. It seems to me that if we're going to do press enterprise, that that says whether there is access at all. But once getting access at all, it seems to me that we then go with a different test. And that would be the time, place, and manner test. Would you agree with that? I think that the compelling government interest test is the better fit for a test. What does that mean? It's also referred to as the overriding interest test, the strict scrutiny test, which was applied by this court in the Associated Press case by the First Circuit. So you're suggesting that rather than use a time, place, and manner test, we have to use the test out of the Associated... Oh, I forgot. I got the wrong name of the case. That case is... Associated Press. Yeah, Associated Press case? Yes. Why? Because when that is a test that this court and other courts apply to determine whether countervailing interests overcome a First Amendment right of access. Well, how does time, place, and manner fall into that? Time, place, and manner is a test that the Richmond newspapers... I understand where it came from. And I understood basically reading Planet that this court said, that might be something that we could look at in the future when they sent that back. We recognize that this court certainly said that in Planet One. We think that it's not satisfied in this case. We also, for... Not satisfied or you want a different test? We think the compelling government interest test is the more appropriate test. I understand that. So you're really saying, if we don't take the Press-Enterprise test, we cannot deal with the time, place, and manner test. We've got to instead apply the other test from the associated case. Should this court decide that the time, place, and manner test is the appropriate test to apply, it must be applied in accordance with the precedent in this circuit. And there is precedent, which we have cited in our briefs, discussing every prong of that test. And there's a compass, tent-based prong, and there's the narrowly tailored test, and there's the alternative channels of communication. And we would submit that... But there can't be any content-based problem in this particular situation because all of the confidential information, you do not challenge at all. The only thing you've got in front of you is just a complaint. We contend in this case that the alternative channels prong cannot be met because... I'm sorry. Finish your answer. Where is it in Judge Otero's opinion that he addresses the... I would call it Ventura policy number 3, that they stop taking filings at 4 and your reporter's allowed to be there till 4? Did Judge Otero address that? That is not addressed in Judge Otero's. That is in our briefing on the fee motion before this Court on the Cross-Appeal. There was a contention that, well, you had partial success in this case. And we said, look, this is what happened after Judge Otero issued his injunction. These are the things that changed. I believe that was in my declaration in support of our fee motion in that case. And that is what I'm pointing to and referencing. Okay. So, I mean, it seems to me that you've won substantially all the victory that you could get out of this because you've established the right of access. You've gotten them to change their policy twice. Why are you arguing against that? I mean, don't you want to say that for purposes of your fee? We're saying that we like Judge Otero's opinion and we like the injunctive relief that he entered and we're asking that it be affirmed. I hope I'm understanding your question correctly. We like the result in this case. We think it's the right result and we think it should be affirmed. Did you want to finish your answer to my question or have you forgotten? I'm sorry. Could you repeat that? No, I don't need it. That's fine with me. I think it's pretty important to you, but it's fine with me. If I remember, the question dealt with the time, place, and manner test and we believe that the second and third prongs fully apply in any case. The precedent from the circuit addresses how they apply and that each prong has to be satisfied in order to overcome the time, place, and manner test and it's on the burden of the party seeking to restrict access. It can't be met here. It seems opposing counsel and others are asserting that the 90-minute or hour-and-a-half delay at the end of the day lost to the media is really a minor delay. So I guess I'm just asking you squarely, why is there a First Amendment right to same-day access? We assert that there's a First Amendment right to timely access. And what that's going to mean in a court that doesn't have procedures that restrict access on an ongoing basis is going to be same day most of the time with some exceptions. And in this case, the scanning policy provided a cutoff access at 3. Complaints could still be filed until 4.30. That is similar to the Ridenour case that Judge Otero relied on, where that court was closing its courtroom at 3 while proceedings still went on until 5. That's on a daily basis, week after week, month after month. If you look at a typical eight-hour day, that's a fifth of it. It means that the courtroom, it means that whatever is scanned into that room on that day, you won't see it earliest until the next court day. And what's your best authority for that? I'm sorry, for what? I'm sorry for what you just outlined. For the proposition that short delays implicate the First Amendment right of access and are worthy of protection, I would point the court to the Pocaskey case. I would point the court to, that's the First Circuit case. I would point the court to the Ninth Circuit's decision in Associated Press. I would point the court to the many decisions I've referenced talking about the importance of contemporaneous access, where our First Amendment right of access is. So are you then, in essence, arguing that any delay, no matter how short, five minutes, ten minutes, is a violation of the First Amendment? We are not asking for instant access. We are not... I'm trying to figure out, how do we draw that line? You tell me. Lay it out for me. I... Because you make it sound easy, and I don't know that it is that easy. I don't think it's an easy question, and I've obviously done a lot of thinking about this issue, and this is where I come out, and I think that Judge Otero was right not to draw a bright line. It's context-specific, I think, fundamentally. In this case, we're talking about newly filed civil complaints and a reporter who shows up every day versus a situation where maybe it's an older record. Maybe it's harder to locate. Maybe you have someone coming up the street you've never met before who's not showing up every day and making this kind of predictable request. But in this kind of a situation, we think timely, again, is the functional equivalent of contemporaneous and means something pretty quickly, and it means the absence of procedures that are going to result in a systematic delay of at least one court day which translates into even longer delays wherever there's a weekend or a holiday. Regarding the exhibit, did your CNS reporters ever ask for access to exhibits? There is, in the record, there is a declaration from Juliana Krolak, who is the Ventura reporter, and she had asked a question about the scanning procedure and was told, you know, don't talk to me, talk to your lawyer. Answer my question. She...  because it's really a yes or no question. The exhibits are part of a complaint, and she asked to see new complaints in a timely manner. So that's how you claim she asked for the exhibits. We pointed out the problem of the exhibits in interrogatory responses in this case, in deposition responses in this case. She felt she couldn't... Did you ever experience a delay in obtaining exhibits from Ventura County after you requested them? And if so, point to me in the record where that happened. We requested, we pointed out that it was a problem in the interrogatory responses and they did not change their policies. So the answer to my question, you're not doing a very good job at that. I'm sorry. Okay. So did you... Can you tell me if you ever experienced a delay in obtaining exhibits from Ventura County after you requested them? I... We did not specifically say, may I please see the exhibits... And you can't point to an instance where you were denied? Yes, we can. Okay. Then maybe you should leave with that then. I'm not... I got you. I am trying to figure out whether or not you have properly teed this issue up and I think... I don't know why I'm having trouble getting a straightforward answer here. I'm sorry. Did we say, may I please see the exhibits? And the answer is no for the reasons that I've just articulated. Did we ask to see the new complaints in a timely manner? Yes. And it's our contention that the 11th Circus FTC case makes the point that exhibits are a part of the complaint. They're part and parcel. We didn't think that we needed to make a separate order. Okay. Thank you. Maybe that's my question on that front, but I just have one last question from my... Just word level permit. And just in thinking about what you've answered here today regarding the timeliness, I'm just trying to really figure out what the difference is in your assessment between contemporaneous and immediate. You argue for contemporaneous, but it seems like you're really asking for immediate. And I need you to help me understand that. I've been unable to draw a bright line from a practical perspective. What courthouse news has seen in other courts and what is in the record from what it has experienced in other courts and what it thinks is timely here is accessed by the end of the day with some exceptions here and there. In a paper court, maybe there is a complaint that seeks a TRO and it has to get to a judge right away. Or maybe it gets left on an ink-tape clerk's desk. We're not saying that's a First Amendment violation. Well, Judge Otero rejected that, right? He said he wasn't going to have a requirement of same-day access. He said, I'm not finding a bright line rule of same-day access in all situations. But I would contend that what he said was unconstitutional because it deprived courthouse news of timely access were policies that were, when you take them away, the practical result is going to be accessed by the end of the day in those circumstances. If there are no more questions, I've far exceeded my time. Yes, you have. Do we have a mickey on your side in this case? Okay, thank you. Good morning, Your Honors, and may it please the Court, Caitlin Voges for amici curiae, the Reporters Committee for Freedom of the Press and 27 media organizations. The main point I'd like to emphasize for Your Honors today is from the perspective of amici,    Amici are news media organizations that provide timely access to civil complaints. Amici are news media organizations who rely on the timely right of access to report on newly filed civil complaints every day. And courthouse news service is a direct source of information for many news organizations such as six of the amici, including the Los Angeles Times, the Associated Press, and the Wall Street Journal, all of whom are subscribers to courthouse news service. Other news organizations rely on the First Amendment right of timely access when they send their own reporters to courthouses around the country to access newly filed civil complaints so that they may report on them to the public. And this is often as simply as checking the media bin that is outside the clerk's office for those new copies of civil complaints as they come in. So as a result, the court's decision in this case will impact amici directly, and it is not just courthouse news service's right of access that is at stake. In fact, it is the public's right of access that is at stake in this case, and their ability to learn about the matters that are before the courts as they are filed. The reason for this is because the Supreme Court has recognized that most people learn about judicial proceedings from the news media rather than from observing it directly firsthand. And for the news media, timeliness is an essential component of newsworthiness. Newspapers and the evening news report on matters when they're fresh, the day's events, what just happened. And in the modern era, online news organizations report on events within hours, minutes, or even seconds of when they occur. That's why news organizations like the New York Times or the Los Angeles Times, on their websites, they post a timestamp of when articles are posted or updated so the public knows the very minute that they're receiving news and that that news is most up to date. Other news organizations like Dow Jones Newswires provide financial news and data to subscribers in real time throughout the day. And Twitter feeds, including posts by journalists with breaking news, including about civil complaints, are updated by the second for the public. So just like with other news, the news media relies on timely access to civil complaints so that they can report on them when they are most newsworthy, and that is when they are filed. In our brief, Amiki provided two examples from the LA Times of news articles that were written about civil complaints on the same day that they were filed because the news media was able to obtain access to them. One was a case about wage theft by a home healthcare business, very much of interest to the public. Another was against the Los Angeles Police Department for violations of the California Public Records Act. Again, a matter of extreme interest to the public and only available to the public to know about because the LA Times had timely access to those complaints. So it seems like, you know, you're making clear that your position would be to have same day or near same day access to civil filings. Is that your position? Am I understanding that correctly? Your Honor, based on Judge Otero's ruling in this case, we understand that he found a right of timely access to civil complaints, and we are supporting courthouse news services' argument that there is a First Amendment right of timely access, which might lead you to ask, what does timely access mean? Well, I thought you were making, in your brief, it seemed like you were arguing press enterprise experience and logic text, and maybe I didn't read that correctly, but that, and then allowed, should allow for CNS to have same day or near same day access. Is that not what you argued in your brief? Yes. So we're arguing for timely access, which in most instances will mean same day access. But I think what I'm trying to get at is what is a D.C. Circuit case, In re Reporters Committee that cuts against your position, what's your response to that? So yes, in In re Reporters Committee, the D.C. Circuit held that there was no right of access until judicial action. However, that case has not been followed by other circuits. I would say it's essentially an aberrational case. So if you look at Lagos in the Second Circuit, which found a right of access to summary judgment motions, which was the exact same issue, the exact same type of document issue in In re Reporters Committee, they really rejected that approach from the D.C. Circuit. In NBC's subsidiary, the California Supreme Court decision, the court there noted that the modern trend has been against the court's decision in In re Reporters Committee and more in favor of access that attaches when the document is filed rather than at the point of judicial action. But if we determine that you get a right of access and we have to generally determine how we make that decision about whether you have had that timely right, and if it's a time, place, and manner standard that we apply, why is it not met here? Your Honor, I don't think that the time, place, manner analysis is appropriate for determining whether or not timely access is provided. I understand you may not think it is, but supposing that I believe it is. So if you are going to apply the time, place, and manner analysis, I would say it's not met here for two reasons. The first is that the burden is on the Ventura Court. I understand that, but I look at what they did and I'm having a tough time understanding why they didn't show that they used that. So they have to show a significant government interest that would demonstrate the delay. Here, there is no significant government interest that would justify the delay in this case. So the court's own procedure at putting stuff together on its own calendar is not a significant interest. Your Honor, I'm not aware of any case that's held that type of kind of administrative interest is a significant interest under the time, place, and manner test. Why not? Because it has to rise to a certain level. It's not just any interest that will do it. It has to be a significant interest. All we have to find is time, place, and manner. We have to find an interest. I appreciate that, but I guess I'm challenging why do you think that's not enough interest? I think those types of administrative concerns, I guess I would point the court to the Ridenour case that was decided by the Arizona Supreme Court, where there they were looking at, again, similar types of administrative concerns about court security to create a basically 3 p.m. cutoff for allowing access to the courtroom even though proceedings were going to continue to go on after 3 p.m. And there, the court found that that type of interest was not sufficient to satisfy the First Amendment. Well, but that case, I think, in that case, they allowed certain people who are already in to stay in and didn't allow anybody, so there was a disparity there. I think that makes that case distinguishable here because they're treating everybody the same here. I would say, Your Honor, if anything, it makes this case worse because in Ridenour, at least some people were granted access to the ongoing court proceedings and some members of the public had the ability to observe what was happening. Here, when complaints are delayed, no member of the public has access to them for the time period that they're delayed but also even beyond that, potentially, because of the importance of timeliness to newsworthiness. This seems interesting to me that the press would argue that the time when people can file complaints ought to be limited to when they can have access to the complaints. When the court's whole process is simply taking the complaints and then, after taking the complaints, doing what process they need to do to put them down so that you can get access to them, if we went to the far extreme with your analysis, it would seem we've got to cut everything off at 3 o'clock because at that point, they can't file anymore because you can't get access anymore. I mean, I'm just trying to figure out why the court's process is of no value in your calculation. I think the court's process does have value, but on the other side of things, you have to look at the value of the public's right of access. I understand. I understand, but here we're trying to, if we're not in a strict scrutiny situation, and that's where I put you to begin with, in a time, place, and manner situation, and we're not in a strict scrutiny situation, then at that point, I don't know why the court's process isn't very well enough reason to do what they've had to do here. So another reason I would say is because, as part of the time, place, manner analysis, the court has to look at whether alternative channels of communication are available, and as I believe you've discussed with both parties, that prong of the time, place, manner analysis simply cannot be met in a situation where... Well, isn't that the third prong? Yes. And why do we even have to apply a third prong? If it isn't applicable in this particular situation, why not apply the first two prongs and let it sit? It sounds like what Your Honor is suggesting is maybe cutting short the time, place, manner analysis to get rid of an entire prong of it. Well, I can't apply it as it is, so I've either got to not apply it at all, or I've got to rewrite it. So I would say the former is more appropriate. If the time, place, manner analysis doesn't fit the situation, that tends to suggest that it's not the appropriate analysis. And again, we do argue that the overriding interest test that was announced in Press Enterprise 1 is the appropriate analysis here. And the court, the Ninth Circuit and Lee v. Salazar found that when the First Amendment right of access applies, the appropriate test to determine if it is overcome is the overriding interest test and not the time, place, manner test. So again, we would emphasize that the overriding interest test is the test that the court should apply here. I think what the district court found was that given the evidence in this case that Planet had failed to meet its burden of demonstrating that taking the time for processing before scanning and providing, that it was essential to preserve higher values or is narrowly tailored to serve a substantial government interest. So it's more a proof issue that he still applied the time, place, manner test. Your Honor, I believe that is in fact what I'm referring to as the overriding interest test. And if I could just read to you from Press Enterprise 1 where the court said, the presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest, which I believe mirrors the language that Your Honor was just quoting. So again, that is the overriding interest test. That is the higher test that the Supreme Court has articulated applies when the First Amendment right of access applies. And Your Honor, just one more point very briefly. In addition to the importance of timeliness to newsworthiness, I just also want to point out that timeliness is extremely important to accuracy. Timely access is necessary for the press to report accurately and completely on civil complaints. Journalists know that the most authoritative source of information are the court documents themselves, and they want to be able to read those and in some cases actually provide links or embed them in their news stories so that the public has access to that complete and accurate information as well. So that's an additional reason that the First Amendment right of access, it's very important that it be timely for the news media to be able to answer the public. And if the court has no further questions, we would agree with CNS that the court should affirm. All right. Thank you, counsel. Thank you. All right. Five minutes. Four brief points and I would try not to take the five. First on whether strict scrutiny is the standard. Press Enterprise says, as counsel says, Globe Newspapers, which is a follow-up case, Footnote 17 says, but if it's not a denial and it's more like a delay, time, place, matter, which is why we're here. Right now are the cases that counsel's relying on where the court access was denied to people after 3 o'clock. You can see why that would be strict scrutiny because the trial happens once and if you're not there, you can't participate, you can't watch, you can't do anything, as opposed to a complaint where even if the court is closed at 3 o'clock, you get it the next day. Okay, on that point. Yeah. Is there a third policy now or is Ventura only taking complaints up to 4 and are they allowing the reporter to be there? The only policies under review are the ones that I described, which is the 3 o'clock with the drop box at 4.30. After the court entered his injunction, we had to comply with it and the only thing we could do was get rid of the drop box and extend our court hours. But why isn't that the most reasonable solution? If you say that the First Amendment either prohibits courts from accepting complaints after a certain time or you say that the First Amendment requires the court to maintain hours, I suppose that would be a reasonable alternative. What we're trying to do is make sure we're not violating a federal court injunction while we appeal. So the issue for you, respectfully, the issue for you is the scanning policy, which was 3 o'clock with access to everything after that the next day. But what's happened in the current procedure? Has the sky fallen right now? It's actually no different. The same procedure happens except the hours are different and now they're ripping apart the complaints in ways that they didn't before because they tried to scan the exhibit. Well, how long has that been in place? Since... I couldn't give you the precise date, but after the judgment was final, we changed the policy. If you go on the court's website, the revised policy is there. It was based on the fact that Ventura County failed to make a showing that there was a significant interest in having the gap between 3 and 4.30. First, the reason we made the change is that we were ordered to. Judge Otero ended up saying you did not meet your burden of showing why there should be this delay. And so I think that's what Judge Otero was asking you. So what's your response to that? I mean, why was Judge Otero wrong? Two, he relied on right now, which as I explained is totally an opposite in our view. And the second, that's saying that there's a right of same-day access even though in the prior paragraph he said there is no such right. So the problem I've got was... He didn't want a bright-line rule, but he was saying what was reasonable under the circumstances and you didn't meet your burden of showing that there was some governmental interest. I mean, tell me what it is. What is... What's in the record that says that Ventura County has a significant interest in having one point in time where they kick out the reporter and another point in time where they stop taking filings? All... A number of Supreme Court decisions recognize that courts have the inherent power to operate the proceedings. What... You know, administrate their offices and maintain office hours. We've cited those in our brief. But... No, but what was in the record factually as to what was Ventura County's... I mean, he discusses some declarations from Planning and his deputy, I guess. Yes. What did they... What did they say? Why did they have to do it that way? They did it that way. They shut at 3 o'clock because they were understaffed because of the budget shortfalls   and 4.30, they could take people off of the public windows to catch up on the backlog so that we could do what we were supposed to do and we could do what we were supposed to do to do our primary job which is service the public... You know, the litigants. And that's what the... And that's in the record. So that's why the doors closed at 3 o'clock but we kept working and as I said, the rules of court but that's also in the record say that when you close, you can close at 3 o'clock but if you do, you have to have a drop box which is what they did. So we were complying with California law and trying to operate the court. We exist in many respects for the public but we also exist to provide access to justice for the litigants and the backlogs that's been the history of this case in the beginning have been significant. So their answer was with short funding and short staffing, cut back on the public office hours so I don't have to have people out there on the clerk's line and I can put them back to deal with the backlog of materials. Again, because it's a paper. The order from Judge Otero I guess was dated  so you've been operating under the 4 o'clock... Oh, I'm sorry. Under the 4 o'clock p.m. cutoff, I guess. Yes. So that was the order for access for filing. Is that right? Correct. For two years. Yes. And we were operating under our regular scanning policy which is virtually the same thing other than the office hours change and we now add exhibits for two years before the assembly judgment order was put into place. That's why in our brief  which are important. First, we think ordering a court to stop doing something that it had stopped doing two years before strikes me as an odd proposition. We think that's moved. But even if it's not take a look at your decision in TRW and it also cites the United States versus W.T. Grant case. Both of those have really good discussions about the distinction between mootness you don't need very much to keep a case alive versus cognizable danger I think that's the language that the court house news has to show to justify prospective relief based on voluntary secession. And that's what I think this case is. Well, I don't think your first policy is moot because you could go back to it. Right. Well, that's Your Honor respectfully we're talking about a court here. It's a public entity. We at least get a presumption of good faith. But I'll take that as a given that mootness is a hard point. It always is. But that doesn't mean that it's just because something isn't moot that those same lack of facts provide a basis for prospective relief two years after the policy was abandoned. And that's the TRW case talks about Don't worry, we'll look at it. And the United States versus W.T. Grant. But the TRW case is great because it explains this in really good detail. All right. Why don't we go on to the Yamasaki case. Thank you for your In this case, court house news service versus planet will be submitted and we'll take up court house news service versus Yamasaki. Thank you, Your Honor.
judges: Wardlaw, N.R. Smith, Murguia